Lena Vern **DANDRIDGE**

v.

**JEFFERSON PARISH SCHOOL
BOARD** et al.

**Civ. A. No. 14801.**

United States District Court,
E. D. Louisiana,
New Orleans Division.

Order Aug. 10, 1971.

Reasons for Ruling Aug. 13, 1971.

Lionel R. Collins, Gretna, La., A. M. Trudeau, Jr., New Orleans, La., for plaintiffs.

Wallace C. LeBrun, Metairie, La., for Jefferson Parish School Bd.

Hendrik Uiterwyk, of Terriberry, Carroll, Yancey & Farrell, New Orleans, La., for intervenor.

## REASONS FOR RULING

CHRISTENBERRY, District Judge.

Pursuant to this court's order of July 9, 1971, the defendant, Jefferson Parish School Board, submitted a new desegregation plan on August 2, 1971, to cover the elementary and middle schools of Jefferson Parish, Louisiana, commencing with the 1971–1972 school year. It was the School Board's opinion that the plan was not educationally sound and not constitutionally required and, therefore, the Board did not recommend the plan. The court has studied the plan and has held open-court hearings on August 7 and 9, 1971, to determine whether the plan complies with constitutional requirements and whether it can feasibly be implemented.

In the school year ending in June, 1971, the School Board was operating 75 public schools in Jefferson Parish, and serving 63,000 pupils. Approximately 80 percent of these pupils are white and 20 percent are black. The evidence presented prior to the order of July 9, 1971 demonstrated that the Parish school system contained 19 one-race or virtually one-race schools, more than one-fourth of the total number of public schools in the Parish. It was further shown that approximately 13,000 pupils or 21 percent of the total, attended these one-race schools. It was this court's opinion then and it is now that the perpetuation of this degree of segregation negated the School Board's argument that it had completely abandoned its dual system of public education.

Under the new plan submitted by the School Board a creditable effort has been made to integrate all public schools in Jefferson Parish so that no school is racially identifiable. Relying on the information made available by the School Board, the plaintiffs unqualifiedly endorsed the plan and asked that it be adopted by this court. Based on anticipated enrollments, the plan would integrate the Parish elementary schools in varying white-black ratios that range from ten percent black pupils in some schools up to 38 percent black pupils in others. The integration of middle (junior high) schools would vary from 13 percent black pupils to 40 percent black pupils. The court had directed that the School Board be guided by the racial balance principle but at the same time minimize busing and preserve geographic zoning criteria as much as possible by the use of other means of school desegregation. To this end the Board, in formulating its plan, altered boundaries for elementary and middle school attendance zones and thus limited busing to a maximum of an additional 3,000 pupils. The

resulting variance in percentages is in this light understood. Racial housing patterns and natural and non-natural geographic barriers also, of course, help explain these variances. Inasmuch as the Parish serves approximately 63,000 pupils, 13,000 of which were formerly in one-race schools, a plan that integrates all previously one-race schools while requiring busing for no more than 3,000 additional pupils, less than five percent of the total, is not considered by this court to place a severe burden on the School Board.

█ Of these 3,000 additional children that may be subject to busing, the School Board presented evidence to the effect that 90 percent are black. While it would be impermissible for the Board, in complying with a constitutional duty, to place a heavier burden on one race by design, there was no showing of bad faith in this regard. Plaintiffs' counsel, moreover, saw no reason to object to the plan for this (or any other) reason.

Evidence was also received at the August 9th hearing concerning logistical difficulties that the Board anticipates would result from the institution of the new plan. A witness for the Board testified that from 20 to 30 additional buses would be required. It is pertinent, however, that the Parish does not buy or own any of the buses used to transport pupils to and from school. Instead, bus drivers are employed who provide their own buses and they are paid by the state approximately $7,000.00 per annum. The Parish School Board then supplements each driver's salary by $305.00 per annum, meaning that the additional cost in transportation to the Parish, if in fact 30 additional buses are needed, would be approximately $9,150.00. In addition, there was testimony to the effect that new buses are not readily available and that difficulties will be encountered in notifying parents and children of new school assignments. While the court deems this evidence relevant to the feasibility of adopting a new plan, such evidence is not of paramount consideration where constitutional rights are at stake and where the law, for a number of years, has clearly charged school boards "with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Green v. County School Board, 391 U.S. 430, 437–438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968). The fact that a temporary, albeit difficult, burdent may be placed on the School Board in the initial administration of the plan or the fact that some schools may not begin the school year in a routinely smooth fashion does not justify in these circumstances the continuation of a less than unitary school system and the resulting denial of an equal educational opportunity to a certain segment of the Parish school children.

Evidence presented at the August 9th hearing also indicated that under the plan the average daily roundtrip distance for the additional pupils to be bused will be about seven miles as opposed to a previous average roundtrip distance of about two and a half miles for pupils already being transported. One witness testified that the longest roundtrip distance for any child will be 14 miles and that the time for this roundtrip would be one hour. Busing has for many years been widely used in Jefferson Parish due to the suburban and semi-rural nature of the area. It is the practice of the School Board to provide transportation for all pupils living more than a mile from school and for those living less than a mile from school if a safety factor is involved. While the court is cognizant of the complications that can arise from busing young children, the burden in this set of circumstances again does not appear excessive for either the children, their parents, or the School Board. There is little room for doubt that much of the busing which is required in Jefferson Parish is due to the past practices of a dual system, the vestiges of which have lingered on.

█ As the Supreme Court stated in Swann v. Charlotte-Mecklenburg Board

of Education, 402 U.S. 1, 31, 91 S.Ct. 1267, 1283, 28 L.Ed.2d 554 (1971), "[d]e-segregation plans cannot be limited to the walk-in school." In *Swann* the average roundtrip distance that elementary children were transported was twice that of this case. The Supreme Court gave approval to that plan and to busing as a permissible tool of school desegregation. The relevant factors to be considered for the approval of a plan that entails some busing are the time and distance of travel, the age of the pupils, the capacity of the school system to provide transportation, and the extent to which busing has previously been a characteristic of the system. Considering all of these factors, the court finds that the busing called for in the School Board's plan is reasonable and workable. More importantly, the plan should establish a genuinely unitary school system that will be realistic and effective.

Finally, the School Board, in not recommending the plan, contends that a unitary system has existed in Jefferson Parish since 1969 and that all of the existing one-race or virtually one-race schools are the result of de facto segregation and, therefore, the school system is not susceptible to the type of relief sought by plaintiffs. For the reasons set forth below, this contention is unfounded and erroneous.

■ It is true that the mandate of the Fourteenth Amendment's equal educational opportunity principle to eliminate dual-system education and to establish workable and effective unitary systems is directed only to de jure segregation. Swann v. Charlotte-Mecklenburg Board of Education, *supra*; Green v. County School Board, *supra*; Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686, 98 L.Ed. 873 (1954). This mandate, however, does not cease merely because school authorities in a system with a history of school segregation undertake some desegregation, but rather the duty continues until all vestiges of the de jure system are eradicated. While the point at which this occurs may not always be easily discernible, the need

for further relief in the Jefferson Parish system is clear. As stated above, the segregation of 19 of the 75 Parish schools has remained intact, meaning that over one-fifth of the pupils served by the Parish remain in a segregated school environment.

■ Beginning with the 1965–1966 school year, by this court's order, the compulsory dual school system of Jefferson Parish was formally discontinued and a plan was implemented which embodied the freedom-of-choice concept. Because of this plan's ineffectiveness and in accordance with *Green, supra,* this court adopted another plan commencing with the 1969–1970 school year and ordered the Board to operate a unitary, non-discriminatory system. At that time the extent of the court's remedial power in dealing with the vestiges of a dual and unconstitutional school system was undefined. In the *Swann* decision, however, the Supreme Court squarely confronted this issue and discussed the means that are within the discretionary use of a district court for the elimination of the remnants of state-imposed segregation. The fact that the School Board may have been under the impression that a unitary system was in operation in Jefferson Parish and the fact that the Board complied with the 1969 order is not grounds for a denial of further relief here. "[W]hatever plan is adopted will require evaluation in practice, and the court should retain jurisdiction until it is clear that state-imposed segregation has been completely removed." *Green, supra,* 391 U.S. at 439, 88 S.Ct. at 1695.

The contention of the School Board that the persistence of one-race schools should be attributed to residential housing patterns and therefore should be labeled de facto segregation is to bypass the realistic view that the former dual system has never been fully dismantled. That the court now finds that further relief must be granted is not to say that the School Board has not been operating in good faith, but rather it is based upon an evaluation of the system's

operations prior to and since 1969 in juxtaposition to *Swann.*

■ It is the court's duty now to try to ensure that the relief rendered will fully comport with constitutional requirements and thus at last establish a unitary system. To this end the court feels that the one-race schools in the Parish can no longer be tolerated. When a school board undertakes to convert a dual system into a unitary system with the result that a substantial number of one-race schools remain, then it is presumed that the conversion has been incomplete. To rebut this presumption, it was incumbent upon the School Board officials to show that these one-race schools are "not the result of present or past discriminatory action on their part." *Swann, supra,* 402 U.S. at 26, 91 S.Ct. at 1281.

The only evidence that the school officials mustered to refute this presumption of continued de jure segregation was an allusion to housing patterns. In view of the Parish's past history of officially sanctioned school segregation and because these schools cannot be said to have been desegregated and then resegregated by shifting population trends the court is not persuaded that this is a de facto situation. In reply to the argument that school authorities with a history of de jure segregation need only devise a colorblind assignment plan, the Supreme Court stated in *Swann, supra,* 402 U.S. at 28, 91 S.Ct. at 1282:

> " 'Racially neutral' assignment plans proposed by school authorities to a district court may be inadequate; such plans may fail to counteract the continuing effects of past school segregation resulting from discriminatory location of school sites or distortion of school size in order to achieve or maintain an artificial racial separation. When school authorities present a district court with a 'loaded game board,' affirmative action in the form of remedial altering of attendance zones is proper to achieve truly nondiscriminatory assignments. In short, an assignment plan is not ac-

ceptable simply because it appears to be neutral."

Applying this doctrine and remembering that "[t]he measure of any desegregation plan is its effectiveness," Davis v. Board of School Commissioners, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971), the court finds that the 1969 plan was inadequate and must be superseded by the new plan.

■■ In accordance with *Swann,* if the implementation of this plan results in full compliance with the *Brown* decision, then the School Board will be relieved from making further adjustments in school desegregation. 402 U.S. at 31–32, 91 S.Ct. 1267. It is hoped that this plan, coupled with the Board's good faith, will make future adjustments unnecessary by this court's order. Good faith encompasses, *inter alia,* strategically selecting the construction sites of future schools so that desegregation will be enhanced; the number of pupils to be accommodated by new schools; and by the old schools that the School Board decides to abandon. A recurring problem for a court in adopting a desegregation plan is often the foreseeability of resegregation. The Board is therefore charged with the duty of pursuing a school construction and abandonment policy which will in all respects enhance and facilitate desegregation. See *Swann, supra,* 402 U.S. at 20–21, 91 S.Ct. 1267.

■ The court feels constrained at this point to address briefly the doubts raised by counsel for the School Board concerning the continued quality of public education in the Parish school system. The attitude of the public has all too often reflected an unwillingness to make a short-term sacrifice in public education in order to achieve important long-range goals; namely, an equal education for persons of all races, and, correspondingly, an equal opportunity for all persons to enter the economic mainstream of American life. In this case, however, the burden to be incurred by the defendant School Board in implementing this plan is so de minimis in and

of itself and compared with other school desegregation cases that the court does not agree that any decrease in the quality of education should result from this plan. In addition, the guarantee of an equal educational opportunity is in no way limited to the central city of a metropolitan community, but is equally applicable to suburban areas. In other words, suburban school boards are not immunized from the responsibilities of the Fourteenth Amendment even though it means facing problems that have long beset the adjacent central city.

In accordance with these written reasons, plaintiffs' motion for further relief is granted and the plan submitted by the Jefferson Parish School Board on August 2, 1971, is adopted. The court entered its order to this effect on August 10, 1971.