## WINSTON-SALEM/FORSYTH COUNTY BOARD OF EDUCATION *v.* SCOTT ET AL.

No. A–233 (71–274). Decided August 31, 1971

See: 444 F. 2d 99.

MR. CHIEF JUSTICE BURGER, Circuit Justice.

The Board of Education of the Forsyth County, North Carolina, school system has applied for a stay of a decision of the United States Court of Appeals for the Fourth Circuit, dated June 10, 1971, and subsequent orders of the United States District Court for the Middle District of North Carolina entered pursuant thereto, pending disposition of the Board's petition for writ of certiorari to review the decision of the Court of Appeals. The operative order of the District Court is dated July 26, 1971; it adopts a plan for pupil assignment designed to desegregate the public schools of Forsyth County.

The affected schools were already scheduled to open Monday, August 30.

The application for a stay was filed August 23, 1971, and the response thereto on August 26, 1971, making that date the earliest possible date for this Court or a Justice to act on the stay.

The background is of some importance.

Respondents, who are Negro pupils and parents in the school system, commenced action alleging that the School Board was operating a dual school system, and seeking appropriate relief. The school system embraces both rural and urban areas in a county school system. The District Court found that in December 1969 there were 67 schools in the system with approximately 50,000 students. The total student population was 72.5% white and 27.5% Negro. Of the schools, 15 were all-Negro and seven were all-white. Of the remaining schools, 31 had less than 5% of the minority race. The school system was operated under a geographical attendance zone system, with freedom-of-choice transfer provisions for all students regardless of race.

Prior to this Court's holding in *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1 (1971), the plaintiffs submitted a plan devised by their consultant, Dr. Larsen; it was designed to achieve as closely as possible a mathematical racial balance in all of the schools of the system equal to that in the system as a whole. It employed satellite zoning and extensive cross-busing. The District Court rejected the plan as not constitutionally required and unduly burdensome.

The School Board then submitted its plan for the 1970–1971 school year to the court for approval. It retained geographic zoning and freedom-of-choice transfer provisions, but with certain modifications allowing priority to majority-to-minority transfers and increasing the racial "balance" of several schools. The District

Court in 1970 approved the Board's plan, subject to alterations which prevented minority-to-majority transfers, made changes affecting three attendance zones, and added a requirement that the Board create "innovative" programs designed to increase racial contact of students.

In rejecting the Larsen plan and approving the modified Board plan, the District Court found that the boundaries of the attendance zones had been drawn in good faith and without regard to racial considerations, and to ensure that, so far as possible, pupils attended the schools nearest their home, taking into account physical barriers, boundaries, and obstacles that might endanger children in the course of reaching their schools. The District Court at that time was of the view that the "neighborhood" school concept could not be the basis of assignment if residence in a neighborhood was denied or compelled because of race, but went on to find that the racial concentration of Negroes was not caused by public or private discrimination or state action but by economic factors and the desire of Negroes to live in their own neighborhoods rather than in predominately white neighborhoods. That finding has not been reviewed. Finally, the District Court found that the School Board had acted consistently in good faith, and was of the view that good faith "is a vital element in properly evaluating local judgment in devising compliance plans." 317 F. Supp. 453, 476 (1970).

The District Court's order was rendered in the summer of 1970 and all parties appealed to the Court of Appeals for the Fourth Circuit. While that appeal was pending, this Court decided *Swann* v. *Charlotte-Mecklenburg Board of Education,* 402 U. S. 1 (1971), and related cases. See *Davis* v. *Board of School Commissioners of Mobile County,* 402 U. S. 33 (1971); *McDaniel* v. *Barresi,*

402 U. S. 39 (1971); *North Carolina State Board of Education* v. *Swann,* 402 U. S. 43 (1971).

In light of the *Swann* holding, the Court of Appeals by *per curiam* opinion *en banc* remanded this and several other cases to their respective district courts with instructions to receive from the school boards new plans "which will give effect to *Swann* and *Davis.*" 444 F. 2d 99, 100 (1971). In its remand, the Court of Appeals stated in part:

> "It is now clear, we think, that in school systems that have previously been operated separately as to the races by reason of state action, 'the district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation.' *Davis, supra,* at 37.
>
> .     .     .     .     .
>
> "If the district court approves a plan achieving less actual desegregation than would be achieved under an alternate proposed plan it shall find facts that are thought to make impracticable the achieving of a greater degree of integration, especially if there remain any schools all or predominately of one race.
>
> .     .     .     .     .
>
> "In *Winston-Salem/Forsyth County,* the school board may fashion its plan on the Larsen plan with necessary modifications and refinements or adopt a plan of its choice which will meet the requirements of *Swann* and *Davis.*" 444 F. 2d, at 100–102.

On remand, the District Court interpreted the order of the Court of Appeals to mean that because the State of North Carolina formerly had state-enforced dual school systems, declared unconstitutional in *Brown* v. *Board of Education,* 347 U. S. 483 (1954), the pupil

assignment plan in Forsyth County had to be substantially revised to "achieve the greatest possible degree of desegregation." It concluded that:

> "Despite the substantial difference between the findings of this Court, which formed the predicate for this Court's June 25, 1970 opinion in this case, and the findings which form the predicate of the decision of the District Court in *Swann,* it is apparent that it is as 'practicable' to desegregate all the public schools in the Winston-Salem/Forsyth County system as in the Charlotte-Mecklenburg system and that the appellate courts will accept no less. Consequently, this Court can approve no less. . . ."

The District Court then ordered the School Board to comply with the time schedule set by the Court of Appeals in submitting the required plan. Just why the District Judge undertook an independent, subjective analysis of how his case compared factually with the *Swann* case—something he could not do adequately without an examination of a comprehensive record not before him—is not clear.

The school authorities, declaring that they considered themselves "required" to do so, adopted a revised pupil assignment plan which was expressly designed *"to achieve a racial balance* throughout the system which will be acceptable to the Court." (Emphasis added.) Prior to the adoption of the revised plan, the school system transported about 18,000 pupils per day in about 216 buses. The drafters of the revised plan estimated that it would require at a minimum, with use of staggered school openings, 157 additional buses to transport approximately 16,000 additional pupils.

The Board submitted the plan to the District Court under protest and voiced strong objections to its adoption. A Board resolution submitted with the plan stated

in conclusion that it was submitted to "accomplish *the required objective* of achieving a racial balance in the public schools . . . [but it] is not a sound or desirable plan, and should not be required . . . ." (Emphasis added.) On July 26, 1971, the District Court accepted the plan, noting that it was "strikingly similar" to the Larsen plan which it had previously refused to implement as not constitutionally required.

On August 23, the School Board applied to me, as Circuit Justice, for a stay pending disposition by the Court of its petition for writ of certiorari, filed the same day, seeking review of the remand order of the Court of Appeals; the response was received, as previously noted, August 26, 1971. The Board states that it has not applied previously to either the District Court or the Court of Appeals for a stay because the language of the decisions and orders of those courts makes it clear that neither would grant a stay and because there was not time to do so prior to the opening of the new school year.

In its present posture this stay application, like that presented to MR. JUSTICE BLACK and acted on by him August 19, 1971, in *Corpus Christi Independent School District* v. *Cisneros, ante,* p. 1211, "is in an undesirable state of confusion . . . ."

To begin with, no reasons appear why this application was not presented to me at an earlier date, assuming that I accept the explanation tendered for failure to present it to the Court of Appeals. The time available between receipt of the application and response and the opening of the school term August 30 was not sufficient to deal adequately with the complex issues presented. The application for stay is further weakened by the absence of specific allegations as to the time of travel or other alleged hardships involved in the added bus transportation program. Specific reference to the travel time in

relation to the age and grade of particular categories of students is not disclosed. To assert, as the applicants do, that the "average time" of travel is one hour conveys very little enlightenment to support an application to stay the order of a District Court, however reluctantly entered by that court, especially an order dealing with a school term opening so soon after the motion was first presented. The "average" travel time may be generally relevant but whether a given plan trespasses the limits on school bus transportation indicated in *Swann*, 402 U. S., at 29, 30, 31, cannot be determined from a recital of a "one hour average" travel time.[1]

The Board's resolution reciting that it was adopting the revised plan under protest, on an understanding that it was *required* to achieve a fixed "racial balance" that reflected the total composition of the school district is disturbing. It suggests the possibility that there may be some misreading of the opinion of the Court in the *Swann* case. If the Court of Appeals or the District Court read this Court's opinion as requiring a fixed racial balance or quota, it would appear to have overlooked specific language of the opinion in the *Swann* case to the contrary. Rather than trying to interpret or characterize a holding of the Court, a function of the Court itself, I set forth verbatim the issues seen by the Court

---

[1] By way of illustration, if the record showed—to take an extreme example of a patent violation of *Swann*—that the average time was *three* hours daily or that some were compelled to travel three hours daily when school facilities were available at a lesser distance, I would not hesitate to stay such an order forthwith until the Court could act, at least as to the students so imposed on. The burdens and hardships of travel do not relate to race; excessive travel is as much a hardship on one race as another. The feasibility of a transfer program to give relief from such a patently offensive transportation order as the one hypothesized, would also be relevant.

in *Swann* and the essence of the Court's disposition of those issues:

"The central issue in this case is that of student assignment, and there are essentially four problem areas:

"(1) to what extent racial balance or racial quotas may be used as an implement in a remedial order to correct a previously segregated system;

"(2) whether every all-Negro and all-white school must be eliminated as an indispensable part of a remedial process of desegregation;

"(3) what the limits are, if any, on the rearrangement of school districts and attendance zones, as a remedial measure; and

"(4) what the limits are, if any, on the use of transportation facilities to correct state-enforced racial school segregation." 402 U. S., at 22.

After discussing the problem, the opinion concluded:

"If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, *that approach would be disapproved and we would be obliged to reverse.* The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." 402 U. S., at 24.   (Emphasis added.)

Nothing could be plainer, or so I had thought, than *Swann*'s disapproval of the 71%–29% racial composition found in the *Swann* case as the controlling factor in assignment of pupils, simply because that was the racial composition of the whole school system. Elsewhere in the *Swann* opinion we had noted the necessity for a district court to determine what in fact was the racial balance as an obvious and necessary starting point to

decide whether in fact any violation existed; we concluded, however, that "the very limited use made of mathematical ratios was within the equitable remedial discretion of the District Court." 402 U. S., at 25.

Since the second aspect of this case falls within the fourth question postulated by the Court in *Swann* it may be useful to refer to the Court's response to that question. After noting that 18 million students were transported to schools by bus in this country in 1969–1970, the Court concluded:

> "The importance of bus transportation as a normal and accepted tool of educational policy is readily discernible in this and the companion case, *Davis, supra.* The Charlotte school authorities did not purport to assign students on the basis of geographically drawn zones until 1965 and then they allowed almost unlimited transfer privileges. The District Court's conclusion that assignment of children to the school nearest their home serving their grade would not produce an effective dismantling of the dual system is supported by the record.
>
> .  .  .  .  .
>
> ". . . In these circumstances, we find no basis for holding that the local school authorities may not be required to employ bus transportation as one tool of school desegregation. Desegregation plans cannot be limited to the walk-in school.
>
> "An objection to transportation of students may have validity when the time or distance of travel is so great as to either risk the health of the children or significantly impinge on the educational process. District courts must weigh the soundness of any transportation plan in light of what is said in subdivisions (1), (2), and (3) above. It hardly needs stating that the limits on time of travel will vary

> with many factors, but probably with none more than the age of the students. The reconciliation of competing values in a desegregation case is, of course, a difficult task with many sensitive facets but fundamentally no more so than remedial measures courts of equity have traditionally employed." 402 U. S., at 29–31.

No prior case had dealt directly with bus transportation of students in this context or the limits on the use of transportation as part of a remedial plan, or with racial balancing.

This case is further complicated by what seems to me some confusion respecting the standards employed and the findings made by the District Court and the terms of the remand order of the Court of Appeals. Under *Swann* and related cases of April 20, 1971, as in earlier cases, judicial power can be invoked only on a showing of discrimination violative of the constitutional standards declared in *Brown* v. *Board of Education,* 347 U. S. 483 (1954). In findings dated June 25, 1970, the District Court sent the case back to the School Board for changes to eliminate the dual school system; it approved the plan submitted subject to several modifications. The modified plan was before the Court of Appeals when this Court decided the *Swann* case. The Court of Appeals in its remand following the decision in *Swann* did not reverse the District Court's findings, but, rather, directed reconsideration in light of *Swann.* In the circumstances that was an appropriate step. The present status of the findings is not clear to me, but the District Court on reconsideration following the remand seems to have thought that it was compelled to achieve a fixed racial balance reflecting the composition of the total county system. The explicit language of the Court's opinion in *Swann* suggests a possible confusion on this point. I do

not attempt to construe that language, but simply recite it verbatim: "The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." 402 U. S., at 24.

On the record now before me it is not possible to conclude with any assurance that the District Court in its order dated July 26, 1971, and the Court of Appeals in its remand dated June 10, 1971, did or did not correctly read this Court's holding in *Swann* and particularly the explicit language as to a requirement of fixed mathematical ratios or racial quotas and the limits suggested as to transportation of students. The record being inadequate to evaluate these issues, even preliminarily for the limited purposes of a stay order, and the heavy burden for making out a case for such extraordinary relief being on the moving parties, I am unwilling to disturb the order of the District Court dated July 26, 1971, made pursuant to the remand order of the Court of Appeals which is sought to be reviewed here.[2]

The application for stay is denied.

---

[2] In their petition for a writ of certiorari in this Court, the petitioners have elected to seek review here of the remand order of the Court of Appeals of June 10, 1971, rather than having the substantive order of the District Court dated July 26, 1971, first reviewed in the Court of Appeals.