Tallulah MORGAN et al.,
Plaintiffs-Appellees,

v.

John J. KERRIGAN et al.,
Defendants-Appellees,

Boston Home and School Association,
Defendant-Intervenor-Appellant.

Tallulah MORGAN et al.,
Plaintiffs-Appellees,

v.

John J. KERRIGAN et al.,
Defendants-Appellants.

Nos. 75–1184, 75–1194.

United States Court of Appeals,
First Circuit.

Heard on Motion for Stay June 3, 1975.

Decided June 17, 1975.

Thayer Fremont-Smith, Boston, Mass., with whom Owen S. Walker and Choate,

Hall & Stewart, Boston, Mass., were on motion and memorandum for stay for Boston Home and School Association.

Matthew T. Connolly, Boston, Mass., with whom DiMento & Sullivan, Boston, Mass., was on motion for stay for the Boston School Committee.

John Leubsdorf, Boston, Mass., with whom Foley, Hoag & Eliot, Boston, Mass., Richard J. Hiller, New York City, Jeanne E. Mirer, Cambridge, Mass., J. Harold Flannery, Washington, D. C., Lawrence S. Fordham, Boston, Mass., Robert Pressman, Eric E. Van Loon, Cambridge, Mass., Rudolph F. Pierce, Keating, Perretta & Pierce, Boston, Mass., Roger I. Abrams, Cleveland, Ohio, Thomas M. Simmons, Collins & Simmons, Boston, Mass., and Nathaniel R. Jones, New York City, were on memorandum in opposition for Tallulah Morgan and others.

Sandra L. Lynch, Boston, Mass., for Massachusetts Board of Education.

Kevin F. Moloney, Boston, Mass., for Mayor of City of Boston, and others.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

## ON APPLICATIONS FOR STAY PENDING APPEALS

PER CURIAM.

Prior proceedings have established that the existence of segregation in the Boston school system has been brought about by the knowing and purposeful actions over the years of the city school authorities.[1] Now, with the instant motions to stay a district court implementation order of May 10, 1975, we begin to deal with the issues generated by the need to remedy this constitutional violation.

After the district court's decision in June, 1974, on the merits of plaintiffs'

constitutional claim, the initial steps toward desegregation were governed by a plan (Phase I), formulated by the Board of Education of the Commonwealth of Massachusetts, which sought to reduce the number of racially imbalanced schools but did not purport to eliminate segregation. The Boston School Committee requested and was given time to prepare a substitute plan but did not do so in time for the opening of school in September, 1974. The district court ordered that a plan be filed by December 16, and when the Committee refused to approve the plan developed by its employees, counsel filed it with the court. The three committeemen who had voted against submission of the December 16 plan were held in civil contempt, but they purged themselves by authorizing and approving a new plan, filed with the court on January 27, 1975. In the meantime plaintiffs, representing black children and parents, filed an alternative plan. The district court sought assistance in evaluating these various proposals for Phase II; a panel of four masters was appointed to hold evidentiary hearings and make recommendations, and two experts were selected to assist both the masters and the court. The masters' report was filed on March 31. The court received thereafter new data furnished by the school department, modified the plan submitted by the masters, and issued its plan on May 10. The court's memorandum of decision followed on June 5.

Although full presentation of the parties' appeals in this complex matter will require several months, the case has come before this court now on the motions of the School Committee, a defendant, and the Boston Home and School Association, an intervenor-defendant, for a stay of the May 10 order of the district court.[2] Defendants ask that effectuation

---

1. The district court opinion handed down on June 21, 1974, *Morgan v. Hennigan*, 379 F.Supp. 410 (D.Mass.), was affirmed by this court on December 19, 1974. 509 F.2d 580 (1st Cir.), *cert. denied, sub. nom. Kerrigan v. Morgan*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).

2. The state defendants are not included within the term "defendants" as it is used in this opinion. With respect to the legal arguments presented on this stay application, contentions attributed to "defendants" may be those of the city defendants, intervenor-defendant Boston Home and School Association, or both.

of the order, which sets up a detailed timetable for the actions to be taken during the summer to make possible implementation in September of the court's Phase II desegregation plan, be suspended pending the disposition both of this appeal and any subsequent petition for *certiorari.* This would leave school arrangements for the fall of 1975 as they were in the fall of 1974, except possibly for continued development of magnet schools. The stay request is properly before us, since it has already been unsuccessfully made to the district court. Hearing has been had and memoranda submitted.

■ We consider first defendants' argument based upon section 253 of the Equal Educational Opportunity Act of 1974, 20 U.S.C. § 1752. The statute directs that the effectiveness of "any order . . . which requires the . . transportation of any student . . . for the purposes of achieving a balance among students with respect to race" be "postponed until all appeals . . . have been exhausted . . . ." While this might seem facially to apply to the order we are dealing with, it is clear in the light of statutory history and all decisions which have addressed the issue that this law does not affect court efforts to eradicate de jure segregation. Section 253 is simply the restatement of section 803 of the Education Amendments of 1972, 20 U.S.C. § 1653, which had expired on January 1, 1974. *See* 1974 *U. S. Code Congressional & Administrative News*, 93 Cong., 2d Session, at p. 4221 (conference report). Mr. Justice Powell, sitting as Circuit Justice, interpreted section 803 in *Drummond v. Acree,* 409 U.S. 1228, 93 S.Ct. 18, 34 L.Ed.2d 33 (1972). He drew on Chief Justice Burger's comments in *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 17–18, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), with regard to a still-earlier statute, and concluded that the section was designed, at most, "to post-

pone the effectiveness of transportation orders in 'de facto' cases and in cases in which the district court judges have misused their remedial powers."

Justice Powell's interpretation has been followed in every case which has come to our attention. *NAACP v. Lansing Board of Education,* 485 F.2d 569 (6th Cir. 1973); *Vaughns v. Board of Education,* 355 F.Supp. 1044, 1051 (D.Md. 1972) (citing additional unpublished orders of Justices Douglas and Rehnquist, in chambers); *cf. United States v. Board of Education,* 476 F.2d 621 (10th Cir. 1973); *Hart v. Community School Board of Education,* 512 F.2d 37, 52 (2d Cir. 1975). Our earlier decision forecloses argument that this is not a case involving de jure segregation. And, while defendants suggest that the district court's plan goes beyond the elimination of illegal segregation and seeks the achievement of racial balance, *see Drummond v. Acree,* 409 U.S. at 1230–31, 93 S.Ct. 18, we have yet to be persuaded that this characterization of the plan is an accurate one, as our discussion below indicates. We therefore conclude that section 253 does not require a stay of the district court order.

■ Defendants' remaining arguments for the issuance of a stay are directed to this court's inherent power to stay action under a decision pending its appeal. *Scripps-Howard Radio v. FCC,* 316 U.S. 4, 9–10, 62 S.Ct. 875, 86 L.Ed. 1229 (1942). An applicant for a stay pending appeal must demonstrate among other things that there exists a probability that he will succeed in his appeal on the merits. *Virginia Petroleum Job Ass'n v. FPC,* 104 U.S.App.D.C. 106, 259 F.2d 921, 925 (1958), quoted with approval in *Permian Basin Area Rate Cases,* 390 U.S. 747, 773, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); *Automatic Radio Mfg. Co. v. Ford Motor Co.,* 390 F.2d 113, 115 (1st Cir. 1968), *cert. denied,* 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653 (1968).[3] Here, where there has already

---

3. The applicant must also demonstrate that the harm to him if a stay is not granted outweighs the harm to the other parties if the

stay is granted. *Morgan v. Kerrigan,* 509 F.2d 618 (1st Cir. 1975); *Belcher v. Birmingham Trust Nat'l Bank,* 395 F.2d 685 (5th Cir. 1968).

been a determination that school officials have deliberately fostered racial segregation in the schools, defendants' task in justifying a stay of the remedy devised by the district court after much consideration is difficult indeed. *Keyes v. Denver School District*, 396 U.S. 1215, 1216, 90 S.Ct. 12, 24 L.Ed.2d 37 (1969) (Brennan, J., in chambers). The decisions of the United States Supreme Court over the past seven years require that, once a constitutional violation is established, the district court must adopt a plan that provides immediate and effective relief. *Green v. County School Board*, 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann, supra*, 402 U.S. at 15, 91 S.Ct. at 1276. This court's review of orders issued in the exercise of the district court's equitable powers is limited to a determination whether there has been an abuse of discretion. *Keyes, supra; Deckert v. Independence Corp.*, 311 U.S. 282, 290, 61 S.Ct. 229, 85 L.Ed. 189 (1940).

The Supreme Court and the individual Justices sitting as Circuit Justices have been insistent in their refusal to tolerate delay in the implementation of required desegregation. In 1969 the Court vacated in mid-term a stay entered by a court of appeals, vigorously reaffirming *Green, Alexander v. Board of Education*, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). A few months later, still in the middle of the school year, the Court vacated another stay entered by a court of appeals. *Carter v. West Feliciana Parish Board*, 396 U.S. 226, 90 S.Ct. 467, 24 L.Ed.2d 382 (1969). *See also Carter v. West Feliciana Parish School Board*, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1969). In 1970, the Court refused to stay a district court order in *Swann v. Charlotte-Mecklenburg Board of Education*, 399 U.S. 926, 90 S.Ct. 2247, 26 L.Ed.2d 791 (1971). In 1971, it reversed stays granted by courts of appeals in *Swann, supra*, and in *Davis v. Commissioners of Mobile County*, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971).

The Justices of the Supreme Court have exercised their individual judgments with remarkable consistency in denying stays and in reversing stays granted by courts of appeals. *Keyes, supra*, 396 U.S. at 1216, 90 S.Ct. 12 (Brennan, J., in chambers); *Guey Heung Lee v. Johnson*, 404 U.S. 1215, 92 S.Ct. 14, 30 L.Ed.2d 19 (1971) (Douglas, J., in chambers); *Jefferson Parish School Board v. Dandridge*, 404 U.S. 1219, 93 S.Ct. 306, 34 L.Ed.2d 240 (1971) (Marshall, J., in chambers); *Winston-Salem/Forsyth Board of Education v. Scott*, 404 U.S. 1221, 92 S.Ct. 1236, 31 L.Ed.2d 441 (Burger, Ch. J., in chambers). The courts of appeals, heeding *Green, Alexander*, and *Carter*, have followed suit. *See, e. g., NAACP v. Lansing Board of Education*, 485 F.2d 569 (6th Cir. 1973); *United States v. Board of Education*, 476 F.2d 621 (10th Cir. 1973).

Against this formidable background, we assess the remaining claims of the defendants. They argue first that Rule 53(e)(2) of the Federal Rules of Civil Procedure requires that the court "accept the master's findings of fact unless clearly erroneous". This section of the rule has reference to actions tried without a jury, i. e., where the master is to a large extent supplanting a judge as a finder of facts. As to those facts, but not the legal conclusions to be drawn therefrom, the master's findings are more than advisory. Even if the reference here was of this type, the district court could then hear objections to the report and receive further evidence, as the court below did in this case. "The court after hearing may adopt the report or may modify it or may reject it in

While the initiation of Phase II may be accompanied by disruption detrimental to plaintiffs and defendants alike, a stay at this time would override the district court's judgment to the further disadvantage of plaintiffs whose constitutional rights have already been violated.

whole or in part . . . ." Rule 53(e)(2). But the reference here was not a substitute for trial, a trial on the merits of the case having already been completed. This was a reference under Rule 53(c) specifying and limiting the powers of the masters to "report only upon particular issues . . . to receive and report evidence." [4] The district judge could not delegate his duty to evaluate for himself what actions had to be undertaken in order to remedy past failure to comply with the Constitution.

The remainder of the arguments for stay challenge the court's judgment as being without sufficient support in ordering too comprehensive a remedy too soon. The major arguments are that the court had insufficient basis for rejecting both the school committee and the masters' plans.

 Ideally, the School Committee and Superintendent would be the favored source for a plan. The Court in *Green, supra,* 391 U.S. 430, 439, 88 S.Ct. 1689, 1695, 20 L.Ed.2d 716, encouraged school boards to propose, in good faith, plans that had "real prospects for dismantling the state-imposed dual system 'at the earliest practicable date'." But *Green* also makes clear the duty of a district court to reject a plan which in its view has not such "real prospects":

"The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now.*

The obligation of the district courts, as it always has been, is to assess the effectiveness of a proposed plan in achieving desegregation." *Id.*

The masters' report and the court's decision give supportive reasons for rejecting the Committee's submission of a plan which was essentially a freedom of choice plan providing only for weekly or biweekly periods of integration experience.

 The Home and School Association contends that the district court erred in rejecting its offer of proof that not all segregation in Boston was infected by official intent. Although we do not foreclose consideration of this point on appeal, certainly at this time, given the past findings of segregative intent and of wide-spread de jure segregation, we are not prepared to rule that the present remedy is defective for failure to relitigate the origins of each instance of segregation in the Boston school system.[5] Indeed, given the span of years during which the Boston schools have been operated as a dual system, and the interaction between school segregation and housing patterns, *Keyes v. School District No. 1,* 413 U.S. 189, 201–02, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), it is not clear to us that one could ever fully identify patterns of segregation wholly disassociated from official policies.

---

**4.** The Order of Appointment and Reference to Masters of February 7, 1975 specified that the masters were "to hold evidentiary hearings and make recommendations on a desegregation plan." Their report was to "contain their recommendation for a desegregation plan for Boston public schools, together with the reasons for recommending that plan, including discussions of the key issues."

**5.** Although its filing out of time is opposed by the plaintiffs, we have considered on the question of stay the affidavit of Dr. James S. Coleman. Once a proponent of the educational value of integration, Dr. Coleman now seems to advocate that courts, instead of dismantling dual systems, limit themselves to the elusive task of identifying and remedying specific segregative acts. As a practical matter, his thesis

would seem to call only for the "neutral" remedies rejected as inadequate by the Supreme Court. *See Davis v. Board of School Commissioners,* 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971); *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 22–31, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). Moreover, the Supreme Court has ruled in other contexts that the prospect of "white flight" from the public school system is an impermissible ground for avoidance of desegregation. *United States v. Scotland Neck City Board of Education,* 407 U.S. 484, 490–91, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972); *Monroe v. Board of Commissioners,* 391 U.S. 450, 459, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968). We note further that the implications for Boston of Dr. Coleman's data and survey, which deal with other cities and situations, are far from clear.

■ The masters recommended nine geographic districts and a tenth citywide district. The court decided on eight geographical districts and a ninth citywide district. Appellants argue that the masters' plan contemplated much less busing and adhered to more indigenous geographical locations. This, again, is a point we shall examine carefully on appeal. However, the district court accepted many aspects of the masters' plan, and, when making the modifications complained of, had the benefit of new and updated information about the racial composition of each school district that had not been available to the masters. We are conscious of the fact that the court's plan eliminated the masters' district six (Burke) by enlarging Jamaica Plain, West Roxbury, Hyde Park, and particularly Dorchester. But, on this preliminary review, we cannot say that this modification is so unjustified as to indicate a probable abuse of discretion. In East Boston the court's plan envisages the same racial balance as the masters' plan. In the other seven of the court's districts, a racial balance is struck which is closer to the citywide ratio.

■ The defendants challenge the use of this ratio as violative of the teaching of *Swann, supra,* 402 U.S. at 24, 91 S.Ct. at 1280, in requiring a "particular degree of racial balanc[ing] or mixing". However, from the variations in racial composition that are tolerated by the court's plan—from 40 percent to 61 percent, and, in East Boston, to 95 percent whites; and from 48 percent to 33 percent and, in East Boston, to 3 percent blacks—it would appear that no magic, arbitrary ratio is the litmus. *Swann* does not rule out the employment of an overall racial composition as a starting point. On the contrary, the Supreme Court invalidated a legislative attempt to forbid the use of ratios, stating that "some ratios are likely to be useful starting points in shaping a remedy. An absolute prohibition against the use of such a device—even as a starting point—contravenes the implicit command of *Green v. County School Board* . . . that

all reasonable methods be available to formulate an effective remedy." *North Carolina State Board of Education v. Swann,* 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971). The overall citywide ratio is approximated in at most two of the nine districts (West Roxbury and Hyde Park). At least upon initial examination, the methodology of the court would appear not to be outside the pattern established by *Yarbrough v. Hulbert-West Memphis School Dist. No. 4,* 457 F.2d 333 (8th Cir. 1972); *Kelly v. Guinn,* 456 F.2d 100 (9th Cir. 1972), and *Booker v. Special School Dist. No. 1,* 351 F.Supp. 799 (D.Minn.1973).

Moreover, the court apparently had available to it new data about the capacities of different schools which, cumulatively, had a marked effect on its decision. We gather from the court's memorandum of decision that it was influenced by the new data in light of its feeling that a school district should not be so small or racially skewed that if significant numbers of students opted to attend citywide schools, the district schools would soon be left segregated. The court decided to create districts that, with one exception, resembled adjacent districts in their racial composition, so that each district might expect equal access to citywide schools. Nor would the average transportation be in excess of 2½ miles, a figure considerably less than that approved in *Swann, supra* (7 miles). It may be that, on full review of the remedial orders here, we shall reach different conclusions as to particulars. All we are saying now is that at this preliminary stage, conducted under the limited standard of review to which we are bound, we do not find such probability of defendants' success on these challenges as to warrant a stay.

■ Finally, there is the appeal to practicality. There is no denying that the court's timetable imposes a great burden on students, parents, and administrators. From the date of the court's order, there were four months until the opening of school. There are many decisions to be made and actions to be taken

in this period. Mr. Coakley, the school department's expert, deposed that the schedule posed problems that were difficult, that he would rather not face. But the defendants are operating under a continuing duty to take action that promises desegregation *now*. In 1964, in *Griffin v. County School Board*, 377 U.S. 218, 234, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964), and again in 1968 in *Green*, the Supreme Court declared obsolete the formula of mere "deliberate speed". Across the nation there are numerous examples of more expeditious desegregation under forced draft. The Supreme Court decision in *Alexander v. Holmes City Board of Education*, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969), and *Carter v. West Feliciana Parish School Board*, 396 U.S. 226, 90 S.Ct. 467, 24 L.Ed.2d 382 (1969), required changes in the middle of the school year. In all of the following cases less time was allowed than in the instant case to begin the implementation of plans: *Winston-Salem/Forsyth County Board of Education v. Scott, supra; NAACP v. Lansing Board of Education, supra; Nesbit v. Statesville City Board of Education*, 418 F.2d 1040 (4th Cir. 1969); *Kelley v. Metropolitan City Board of Education*, 436 F.2d 856 (6th Cir. 1970); *Dandridge v. Jefferson Parish School Board*, 332 F.Supp. 590 (D.La. 1971); *Mims v. Duval County School Board*, 329 F.Supp. 123 (M.D.Fla.1971); *Booker v. Special School District No. 1*, 351 F.Supp. 799 (D.Minn.1972); *Vaughns v. Board of Education*, 355 F.Supp. 1051 (D.Md.1972); *Stanley v. Darlington County School District*, 424 F.2d 195 (4th Cir. 1970). Indeed, the court in *Vaughns*, 355 F.Supp. at 1060 n. 28, deduced that, for most, if not all, of the Justices of the Supreme Court, eight weeks is the maximum period of legitimate delay in implementing a program of desegregation.

■ In applying the law to these motions for a stay, we have not been oblivious to the problems of putting into operation a plan of large magnitude in such an important area of life as the education of the city's youth. Such problems have arisen in all cases of compelled desegregation, particularly in metropolitan areas. It is in explicit recognition of this fact that the Supreme Court has stated that in light of the complexities inhering in the dismantling of state-established segregated school systems, the better course is to retain jurisdiction until it is clear that disestablishment has been achieved. *Raney v. Board of Education*, 391 U.S. 443, 449, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968). This is what the district court has wisely done here. It therefore has the power, the resources, and the cumulative experience to deal fairly and sensitively with the problems which may arise even when good faith efforts are made on all sides.

The motions for stay are denied, and in order to expedite the appeals the parties are to comply with the briefing schedule entered by separate order this date.