808 F.2d 1057
 43 Empl. Prac. Dec. P 37,095, 55 USLW 2424,
1 Indiv.Empl.Rts.Cas. 1433
 NATIONAL TREASURY EMPLOYEES UNION and Argent Acosta,
President, Chapter 168, National Treasury
Employees Union, Plaintiffs-Appellees,
v.
William VON RAAB, Commissioner, United States Customs
Service, Defendant- Appellant.
 No. 86-3833.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 14, 1987.
 
 Robert V. Zener, Dept. of Justice, Leonard Schaitman, Appellate Staff, Civil Div., Washington, D.C., for defendant-appellant.
 Nelson G. Dong, Terence M. Kelly, Palo Alto, Cal., for amicus curaie, PharmChem Laboratories, Inc.,
 Lois G. Williams, Washington, D.C., Charles C. Garretson, New Orleans, La., Elaine D. Kaplan, National Treasury Employees Union, Washington, D.C., for plaintiffs-appellees.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before RUBIN, RANDALL and HIGGINBOTHAM, Circuit Judges.
 PER CURIAM:
 
 
 1
 This action was commenced on August 12, 1986, by the National Treasury Employees Union and an employee of the United States Customs Service seeking declaratory and injunctive relief against implementation of the Customs Service's "plan to require its current employees to submit to mandatory collection of their urine to screen for the use of illegal drugs as a condition of obtaining promotions and advancement in their careers."[1] Complaint for Declaratory and Injunctive Relief at 1-2. Under the drug testing program, persons tentatively selected for positions that (1) directly involve drug interdiction, (2) require the carrying of firearms, or (3) involve access to classified information, are required to submit to urinalysis. Final selection and placement into one of the covered positions are contingent upon successful completion of drug screening through urinalysis.[2]
 
 
 2
 On October 27, 1986, plaintiffs moved for a preliminary injunction "suspending Customs' urine collection and analysis program, pending final disposition of this complaint." On November 14, 1986, the district court, 649 F.Supp. 380, finding that "numerous constitutional infirmities" plagued the Customs Service's drug testing program,[3] permanently enjoined the program[4] and granted a declaratory judgment that the program was unconstitutional.
 
 
 3
 On November 21, 1986, the Customs Service filed a notice of appeal of the district court's judgment and moved in the district court for a stay pending appeal. The district court denied the stay request on December 3, 1986.
 
 
 4
 The Customs Service has come to this court seeking an expedited appeal and a stay pending appeal; briefing was completed and the motions submitted on December 30, 1986. We granted the Customs Service's motion for an expedited appeal and have scheduled oral argument for the week of February 2, 1987. For the reasons set forth below, we deny the motion for a stay pending appeal, subject to its reconsideration by the panel hearing oral argument in this case.
 
 
 5
 In order to obtain a stay pending appeal the moving party must demonstrate: (1) that it is likely to succeed on the merits; (2) that it would suffer irreparable injury if the stay were not granted; (3) that granting the stay would not substantially harm the other parties; and (4) that granting the stay would serve the public interest. See, e.g., United States v. Baylor University Medical Center, 711 F.2d 38, 39 (5th Cir.1983), cert. denied, 469 U.S. 1189, 105 S.Ct. 958, 83 L.Ed.2d 964 (1985). However, this court has not applied these factors in a rigid, mechanical fashion. See Baylor University Medical Center, 711 F.2d at 39. "Indeed, in Ruiz v. Estelle, 650 F.2d 555 (5th Cir.1981), this Court held that the movant 'need only present a substantial case on the merits when a serious legal question is involved and show that the balance of equities weighs heavily in favor of granting the stay.' " Baylor University Medical Center, 711 F.2d at 39 (citing Ruiz, 650 F.2d at 565).
 
 
 6
 We note first that the legal questions presented by this case are serious questions of substantial import to the Customs Service and its employees and to the citizens of this country. Further, the Customs Service has presented a substantial case on the merits.
 
 
 7
 Balanced against the facts that serious legal questions are presented by this case and that the Customs Service has presented a substantial case on the merits are the equities. Bearing on the equities are two different considerations. First, as the government states, "[t]his appeal presents questions of first impression for this Court...." Brief for Appellant and Memorandum in Support of Motion for Stay Pending Appeal at i. The government further emphasizes "the unsettled state of the law and the complexity of the constitutional issues presented." Id. The correctness of the government's view is amply evidenced by the diverse analyses applied and divergent conclusions drawn by the many courts that have been confronted with the same or similar questions.[5]
 
 
 8
 Second, the circumstances that have attended the implementation and subsequent suspension of the Customs Service's drug testing program, in combination with the imminence of oral argument, militate against the granting of a stay at this particular juncture. The drug testing program was in place for three months before it was enjoined. The program has been stayed by the district court's order for two months. To prevent the Customs Service from reinstituting its drug testing program for another three weeks is not, in our view, hardship sufficient to warrant our action when plenary consideration of the motion can be afforded by the oral argument panel concurrently with its consideration of the merits of this case. There is, of course, always the possibility that any order that this panel might enter today, based on its conclusions about the factors governing the issuance of a stay, might be superseded by a contrary decision of the oral argument panel. An on-again, off-again approach to the Customs Service's drug testing program is certainly not in the public's interest, at least not when the lapse of three weeks may eliminate further undesirable turmoil.
 
 
 9
 We therefore deny the stay, subject to its full reconsideration by the panel hearing the merits of this case.
 
 
 10
 PATRICK E. HIGGINBOTHAM, Circuit Judge, specially concurring:
 
 
 11
 I join in the denial of a stay for the sole reason that a panel will hear oral argument in this case in three weeks, and we do no more than delay full consideration of the application for a stay until that argument. Even so, it bears emphasis that the basis for the district court's ruling is, at best, problematic.
 
 
 12
 * As the record demonstrates, and as the whole nation knows, traffic in illegal drugs with its enormous destruction of life is a national problem. Congress recently responded in a manner not unlike a response to a military threat, appropriating over $1 billion (an increase of 26.4% from the last fiscal year) to the Customs Service for fiscal year 1987 with funding for 1000 additional Customs Service personnel. This means that, with turnover, the Customs Service must recruit 3,000 new employees, and most hiring will be for sensitive positions of trust.
 
 
 13
 The Customs Service requires drug screening for applicants tentatively selected for positions that (1) directly involve drug interdiction, (2) require the carrying of firearms, or (3) involve access to classified information. No screening of incumbents or applicants for other positions is required. All plaintiffs in this case are applicants who assert a constitutional right to be considered for the three categories of sensitive jobs without a test conceded to be 100% accurate in proving that they are not themselves users of drugs. It is undisputed that applicants for the sensitive positions requiring the screening are given notice that they will be asked to furnish a urine sample, may withdraw their application for the sensitive job, and are allowed to provide the sample in the privacy of a closed bathroom stall after removing outer garments in which a false sample or adulterating agent might be hidden. The enjoined threatened deprivations of constitutional right are said to be of rights of privacy, rights to be free of self-incrimination, and due process.
 
 II
 
 14
 The precise privacy interest asserted is elusive, and the plaintiffs are, at best, inexact as to just what that privacy interest is. Finding an objectively reasonable expectation of privacy in urine, a waste product, contains inherent contradictions. The district court found such a right of privacy, but, in fairness, plaintiffs do not rest there. Rather, it appears from the plaintiffs' brief that it is the manner of taking the samples that is said to invade privacy, because outer garments in which a false sample might be hidden must be removed and a person of the same sex remains outside a stall while the applicant urinates. Yet, apart from the partial disrobing (apparently not independently challenged) persons using public toilet facilities experience a similar lack of privacy. The right must then be a perceived indignity in the whole process, a perceived affront to personal identity by the presence in the same room of another while engaging in a private body function.
 
 
 15
 It is suggested that the testing program rests on a generalized lack of trust and not on a developed suspicion of an individual applicant. Necessarily there is a plain implication that an applicant is part of a group that, given the demands of the job, cannot be trusted to be truthful about drug use. The difficulty is that just such distrust, or equally accurate, care, is behind every background check and every security check; indeed the information gained in tests of urine is not different from that disclosed in medical records, for which consent to examine is a routine part of applications for many sensitive government posts. In short, given the practice of testing and background checks required for so many government jobs, whether any expectations of privacy by these job applicants were objectively reasonable is dubious at best. Certainly, to ride with the cops one ought to expect inquiry, and by the surest means, into whether he is a robber.
 
 
 16
 Finally, reliance upon penumbral rights of privacy adds nothing. The content and dimension of such rights are difficult to define, at best. At the least, we know that such rights of privacy have been largely confined to matters of family such as "child rearing and education," "family relationships," "procreation," "marriage," "contraception" and "abortion," as well as the "right to decide whether or not to beget or bear a child." Bowers v. Hardwick, --- U.S. ----, 106 S.Ct. 2841, 2843-44, 92 L.Ed.2d 140 (1986) (citations omitted). I recognize that the Supreme Court has also spoken in terms of an "individual's dignitary interests in personal privacy and bodily integrity." Winston v. Lee, 470 U.S. 753, 105 S.Ct. 1611, 1617, 84 L.Ed.2d 662 (1985). But the Winston court dealt with an intrusion into the body (surgical removal of a bullet). The court balanced the government's need against the extent of intrusion into the body in a coercive environment. Speaking of "dignity interests" out of context is not helpful. Giving the expansive reading claimed for it would implicate testing of intelligence and aptitudes. Many fitness tests would in this broad sense, disclose private matters that are potentially more destructive of "personal dignity"--inquiries, if we succumb to deciding cases by rhetoric, more justifiably called Orwellian than the testing of urine. Surely, the Constitution does not forbid such routine testing for fitness.
 
 III
 
 17
 Reliance upon the fourth amendment suffers from another related problem. There is a substantial question whether requiring the samples as a condition of hire for the three job categories is a search or seizure at all. It seems odd to think of a government agent as "seizing" urine by requiring the sample as a condition to consideration for a sensitive job applied for with full notice of the requirement. But it is argued, government may not require a waiver of constitutional rights as a condition of employment. Again, such an abstraction sheds little light on this problem; it begs the question of what right. If the government has the right to insist upon proof that its policemen of drug dealers not be drug users, and surely it does, the reasonableness of any invasion of right and the correlative reasonableness of the expectation of privacy is a function of the relevance of the job requirement to the job to be done. Certainly it is permissible, even essential, that persons selected for these jobs not be users of illegal drugs. The decision by the executive branch that this testing is necessary protection of its interest is entitled to some deference and I find no record basis here for a substitution of judicial judgment.
 
 
 18
 The government, as an employer, is different from a private employer, of course, but not in all respects. See Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). An anarchist's political view is protected by the first amendment. But I would not suppose that his constitutional protection extends to the right to be an FBI agent. The point is that the government's interest as an employer in fit employees may allow it to deny employment when it cannot as a sovereign attack other consequences to the protected view.
 
 
 19
 Courts have sustained drug screening for railroad employees, Brotherhood of Maintenance v. Burlington N.R.R., 802 F.2d 1016, 1023 (8th Cir.1986), sustained urinalysis drug testing for jockeys, Shoemaker v. Handel, 795 F.2d 1136, 1142-43 (3d Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986) (when jockeys chose to become involved in this pervasively-regulated business and accepted a state license, they did so with the knowledge that the Commission would exercise its authority to assure public confidence in the integrity of the industry); sustained requirements that participants in AFDC programs submit to home visits by Welfare Workers, Wyman v. James, 400 U.S. 309, 326, 91 S.Ct. 381, 390, 27 L.Ed.2d 408 (1971); sustained pre-boarding inspection of airline passengers, United States v. Skipwith, 482 F.2d 1272, 1276-77 (5th Cir.1973). Nor does the fourth amendment prohibit the government from insisting that its contractors consent to searches. Zap v. United States, 328 U.S. 624, 628, 66 S.Ct. 1277, 1279, 90 L.Ed. 1477 (1946), vacated on other grounds, 330 U.S. 800, 67 S.Ct. 857, 91 L.Ed. 1259 (1947).
 
 IV
 
 20
 The district court, apparently sua sponte, also concluded that the proposed drug screening would violate the self-incrimination and due process clauses of the fifth amendment. To the extent the district court's opinion found a violation of the privilege against self-incrimination, it was in error. The privilege protects an accused only from being compelled to testify against himself, or to provide "evidence of a testimonial or communication nature." If withdrawing blood does not violate the fifth amendment, Schmerber v. California, 384 U.S. 757, 761, 86 S.Ct. 1826, 1830, 16 L.Ed.2d 908 (1966), the sampling of urine would seem to be a fortiori an easier case.
 
 
 21
 The district court found, and it appears to have been without any suggestion by plaintiffs below, that the tests were so unreliable as to deny applicants due process of law. No court has ever held that the combination of tests used here denies due process. The conclusion is either without record basis or is directed toward the possibility of errors by the laboratories such as an error in identifying a specimen. Such risk is present in most laboratory evidence. Finally, and apart from the fact that the evidence of reliability points to the opposite conclusion, the district court overlooked the procedure in place that allows an applicant who disagrees with test results to have the sample tested by another laboratory.
 
 V
 
 22
 The district court has shut down the hiring of persons found by Congress to be necessary to combat the illegal importation of drugs. I do not lightly discount the considered judgment of a district judge and my concerns respond to the submissions of the parties made in an emergency application for stay and without the benefit of oral argument. Perhaps more will be developed, but I remain profoundly skeptical.
 
 
 
 [1]
 The plan was outlined in the "Drug Screening Program" Customs Directive issued on August 4, 1986 with an effective date of August 11, 1986 ("Customs Directive of August 4, 1986")
 
 
 [2]
 The Customs Directive detailing the drug testing plan states that "[d]rug screening is required for any change in position, and any competitive staffing action, when such action would result in placement in a position covered by the program." Customs Directive of August 4, 1986 at 2. Current incumbents of covered positions are not subject to drug testing. A covered position comes under the drug screening program only as it becomes vacant, at which point the tentative selectee is subject to drug screening. Id. Accordingly, both Customs' employees selected for promotion or placement to a covered position and applicants for a covered position who apply from outside the Customs Service are subject to drug testing
 
 
 [3]
 The court found, among other things, that the drug testing plan was violative of the fourth amendment, the "penumbral rights of privacy," and of due process
 
 
 [4]
 The Customs Service was enjoined from conducting urinalysis drug testing in the absence of probable cause. National Treasury Employees Union & Argent Acosta v. Von Rabb, 649 F.Supp. at 391 (E.D.La.1986)
 
 
 [5]
 See, e.g., Shoemaker v. Handel, 795 F.2d 1136 (3d Cir.) (finding that administrative search exception to fourth amendment warrant requirement applied to urine testing by racing commission of plaintiff jockeys in heavily regulated racing industry since the state had strong interest in assuring public of integrity of persons engaged in racing industry and since regulation of the industry had reduced the justifiable privacy expectation of those engaged in it), cert. denied, --- U.S. ----, 107 S.Ct. 577, 93 L.Ed. 580, (1986); Division 241 Amalgamated Transit Union (AFL-CIO) v. Suscy, 538 F.2d 1264 (7th Cir.) (finding no fourth amendment violation in urine testing of bus drivers who were involved in "serious accidents" or suspected of being under influence of drugs or alcohol because, in view of transit authority's paramount interest in protecting public by ensuring bus operators' fitness to perform jobs, plaintiff bus drivers had no reasonable expectation of privacy with respect to submitting to urinalysis and further, because conditions of testing were reasonable), cert. denied, 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976); American Federation of Government Employees, AFL-CIO v. Weinberger, 651 F.Supp. 726 (S.D.Ga. 1986) (determining that in light of fourth amendment considerations, plaintiffs were entitled to injunctive relief against periodic drug testing of civilian employees occupying "critical" positions with Department of Army; "reasonable suspicion" standard applies); Lovvorn v. City of Chattanooga, 647 F.Supp. 875 (E.D.Tenn.1986) (finding that drug testing by urinalysis of all firefighters is violative of fourth amendment because "reasonable suspicion" on which testing could be based could not be said to exist and rejecting city's suggestion that court carve out exception to reasonable suspicion requirement akin to administrative search exception because clearly defined standards to protect an individual's privacy expectation that exist in administrative search cases were absent in this case); Capua v. City of Plainfield, 643 F.Supp. 1507 (D.N.J.1986) (finding mass urine testing of fire and police department employees unreasonable and thus, violative of fourth amendment because there was high degree of intrusion, no safeguard of confidentiality, plaintiffs had reasonable expectation of privacy, and there was no individualized basis or even general job related basis for instituting mass urinalysis; under fourth amendment, urinalysis can be required only on basis of "reasonable suspicion" which "requires individualized suspicion, specifically directed to the person who is targeted for the search."); Mack v. United States, No. 86-Civ.-5764 (S.D.N.Y. Apr. 21, 1986) (determining that urinalysis of FBI agent suspected of drug use did not violate fourth amendment because collecting urine is minimally intrusive, this search was not conducted in public view, plaintiff had a diminished privacy expectation as an FBI agent, and FBI has far more compelling interest in having drug-free employees than do other employers because drug involvement of FBI employee jeopardizes national security); Jones v. McKenzie, 628 F.Supp. 1500 (D.D.C.1986) (finding fourth amendment violation in drug testing of plaintiff school bus attendant pursuant to drug testing program initiated as result of increase in traffic accidents and absenteeism and discovery of syringes in restrooms used by transportation employees because there was no probable cause and defendants had no particularized reason to believe plaintiff was a drug user; plaintiff had reasonable expectation of privacy from search which is not, in case of the school bus attendant, outweighed by public safety considerations); McDonell v. Hunter, 612 F.Supp. 1122 (S.D.Iowa 1985) (finding fourth amendment violation in urinalysis drug testing of corrections department employees and concluding that fourth amendment allows government to conduct urinalysis "only on the basis of a reasonable suspicion, based on specific objective facts and reasonable inferences drawn from those facts in light of experience that the employee is then under the influence of alcoholic beverages or controlled substances;" possibility of discovering drug use by employees is too attenuated to make testing constitutionally reasonable); Allen v. City of Marietta, 601 F.Supp. 482 (N.D.Ga.1985) (finding no fourth amendment violation in urinalysis drug testing of "electrical" workers suspected of drug use because although government employees do not surrender their fourth amendment rights by virtue of government employment, government has same right as private employer to oversee its employees and investigate potential misconduct relevant to employee's performance of duties and therefore, employee cannot claim legitimate expectation of privacy from searches of that nature; here, tests were administered in employment context as part of government's legitimate inquiry into drug use by employees rather than for law enforcement purposes)