UNITED STATES of America

v.

STATE OF LOUISIANA.

Civ. A. No. 80–3300.

United States District Court,
E.D. Louisiana.

Feb. 19, 1993.

Franz Marshall, Civil Rights Div., U.S. Dept. of Justice, Washington, DC, for plaintiff.

Thomas Halligan, Asst. Atty. Gen., Louisiana Dept. of Justice, Baton Rouge, for defendant.

ORDER AND REASONS

CHARLES SCHWARTZ, Jr., District Judge.

This matter is before the Court on the state of Louisiana's motion for an order staying the implementation of this Court's remedial plan pending review by the United States Court of Appeals for the Fifth Circuit. The State is joined in its motion by the Louisiana Board of Regents, the Board of Supervisors of Louisiana States University and Agricultural and Mechanical College, and the Board of Trustees for State Colleges and Universities (collectively known as the "state defendants"). Governor Edwin Edwards has also expressed his support for the motion by way of amicus curiae. The United States has submitted written opposition to

the state defendants' motion. After reviewing the parties legal memoranda, the accompanying affidavits of Dr. Salley Clausen, Dr. Sammie W. Cosper, and Dr. Allen A. Copping, as well as the record in this matter, the Court is of the opinion that no oral argument on the motion is necessary and the motion is hereby taken under submission on the briefs. For the reasons stated herein, the state defendants' motion for an order staying the implementation of the Court's remedial plan is hereby DENIED.

## I. LAW OF THE CASE

At the outset, the Court must address the question of whether the law of the case compels it to issue a stay at this time. In support of their argument that a stay should issue, the state defendants rely on the Supreme Court's order staying the implementation of the Court's remedial plan when this matter was last under appellate review,[1] the "law of the case" doctrine, and the doctrine's employment in *Volkswagenwerk v. Falzon*.[2]

In *Volkswagenwerk*, the Chief Justice of the Supreme Court stayed a trial court discovery order pending review of the order by the Michigan Supreme Court. The Chief Justice's stay expired by its own terms after the Michigan Supreme Court affirmed the trial court. The defendant than moved for a stay from the Michigan Supreme Court pending its application of certiorari to the United States Supreme Court. The Michigan Supreme Court delayed in its decision on the motion for a stay and the defendant applied for a stay from the United States Supreme Court. Justice O'Connor, sitting as a Circuit Judge, granted the application for a stay finding that it was "essentially the law of the case" that a second stay issue. Justice O'Connor's decision was based on a determination that one justice could not effectively overrule a previous decision by another justice when the question on the merits of the case remained unchanged.

The state defendants' reliance on *Volkswagenwerk* to bolster their position here is misplaced as this case is in an entirely different procedural posture. When this matter was last appealed, the Supreme Court had not yet had an opportunity to consider the then novel questions presented by this case. Since that time, the Supreme Court has issued a definitive ruling on the question of a state's responsibility to desegregate its public institutions of higher education.[3] This Court applied the legal standards set forth in that decision to the factual circumstances unique to Louisiana and concluded that Louisiana is in violation of the Constitution. The question on the merits has, as a consequence of the reasoning upon which this Court based its decision, been modified markedly since the Supreme Court last stayed the proceedings in this matter. Accordingly, the Supreme Court's prior ruling is not the law of the case with respect to the instant motion for a stay. Rather, the motion must be considered anew under the relevant legal standards set forth by the Court of Appeals for the Fifth Circuit.

## II. LEGAL STANDARDS

While F.R.C.P. Rule 62(c) authorizes the Court to grant the affirmative relief requested by the state defendants, the decision is one within the Court's discretion, and because "such an action interrupts the ordinary process of judicial review and postpones relief for the prevailing party ..., the stay of an equitable order is an extraordinary device which should be granted sparingly."[4] Moreover, when the equitable remedy at issue has been a remedial plan designed to correct the interminable affliction of segregation, the federal judiciary has traditionally spoken in a

---

1. *Southern Board of Supervisors v. United States*, 492 U.S. 934, 110 S.Ct. 17, 106 L.Ed.2d 631 (1989); *Louisiana ex rel. Guste v. United States*, 492 U.S. 934, 110 S.Ct. 18, 106 L.Ed.2d 631 (1989). Originally, this case was set before a three-judge district court panel. When that panel denied the state defendants' last motion for a stay, the appeal of that order lay with the Supreme Court. *See In re Slagle*, 961 F.2d 513, 514 (5th Cir.1992).

2. 461 U.S. 1303, 103 S.Ct. 1810, 75 L.Ed.2d 924 (1983) (O'Connor, J., in chambers).

3. *United States v. Fordice*, —— U.S. ——, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992).

4. *United States v. Texas*, 523 F.Supp. 703, 723 (E.D.Tex.1981) (Justice, J.).

single voice of disapproval.[5] No Court, however, has previously been presented with an opportunity to consider whether the heightened scrutiny associated with the granting of stays in elementary and secondary school desegregation cases is applicable to a higher education desegregation case such as this. Therefore this Court returns to the Supreme Court's decision in *United States v. Fordice* to compare its mandate with that of *Brown* and its progeny.

■ *Fordice* "portends neither the destruction of historically black colleges nor the severing of those institutions from their distinctive histories and traditions."[6] Unlike elementary and secondary school systems, liability in a system of higher public education cannot be premised on racial identifiability alone. Nevertheless, upon a finding of liability, the *Fordice* Court was explicit in its command to end state sponsored vestiges of discrimination in higher education. It follows that, although a determination of liability may involve differing considerations in the context of higher education and elementary and secondary schools, the judiciary's duty is the same once such a finding is made—"to institute meaningful relief which will work immediately to eliminate the past illegality and assure future compliance with the laws of the land."[7] Thus, the heightened scrutiny under which motions for stays have been judged in desegregation cases at the elementary and secondary school level applies here.

■ With this in mind, the Court turns to the specific factors to be considered in making its ruling. Those factors are: (1) whether the movant has made a showing of likelihood of success on the merits; (2) whether the movant has made a showing of irreparable injury if the stay is not granted; (3) whether the granting of the stay would substantially harm the other parties; and (4) whether the granting of the stay would serve the public interest.[8] In applying these factors, the Court is mindful that in this Circuit the "movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of equities weighs *heavily* in favor of granting the stay."[9]

## III. LIKELIHOOD OF SUCCESS ON THE MERITS

■ Undoubtedly, the "legal questions presented by this case are serious questions of substantial import" not only to the state of Louisiana and its citizens but also to students, academicians, and other concerned individuals throughout the United States. Contrary to the suggestion of the state defendants, however, the proper legal inquiries pertinent to a finding of liability have been clearly delineated by the Supreme Court. Similarly, there is no reason to believe that the remedial issues in this case are so novel as to cast in doubt the well-entrenched standards by which court-imposed remedial plans

---

5. *See id.* (citing *Swann v. Charlotte–Mecklendurg Board of Education,* 399 U.S. 926, 90 S.Ct. 2247, 26 L.Ed.2d 791 (1971); *Carter v. West Feliciana Parish Board,* 396 U.S. 226, 90 S.Ct. 467, 24 L.Ed.2d 382 (1969); *Winston–Salem/Forsyth Board of Education v. Scott,* 404 U.S. 1221, 92 S.Ct. 1236, 31 L.Ed.2d 441 (1971) (Burger, C.J., in chambers)); *see also Alexander v. Board of Education,* 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969); *Davis v. Commissioners of Mobile County,* 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971); *Morgan v. Kerrigan,* 523 F.2d 917, 921 (1st Cir.1975) (per curiam) ("The Supreme Court and the individual justices sitting as Circuit Justices have been insistent in their refusal to tolerate delay in the implementation of required desegregation.") (citing cases); *NAACP v. Lansing Board of Education,* 485 F.2d 569 (6th Cir.1973); *United States v. Board of Education,* 476 F.2d 621 (10th Cir.1973); *cf. Florida ex rel. Hawkins v. Bd. of Control of Florida,* 350 U.S. 413, 76 S.Ct. 464, 100 L.Ed. 486 (1956) ("As this

case involves the admission of a [black] to a graduate professional school, there is no reason for delay. [The applicant] is entitled to prompt admission under the rules and regulations applicable to other qualified applicants."), *quoted in, Knight v. Alabama,* 787 F.Supp. 1030, 1356 (N.D.Ala.1991).

6. *Fordice,* —— U.S. at ——, 112 S.Ct. at 2744 (Thomas, J., concurring).

7. *Texas,* 523 F.Supp. at 729 (citing *Green v. County School Board,* 391 U.S. 430, 438 n. 4, 88 S.Ct. 1689, 1694 n. 4, 20 L.Ed.2d 716 (1968)).

8. *See National Treasury Employees Union v. Von Raab,* 808 F.2d 1057, 1059 (5th Cir.1987) (per curiam); *United States v. Baylor University,* 711 F.2d 38, 39 (5th Cir.1983) (per curiam).

9. *Von Raab,* 808 F.2d at 1059 (quoting *Baylor University,* 711 F.2d at 39.) (emphasis added).

have been judged in the past. The lack of dispute with regard to the legal issues involved in this case does not, of course, diminish the seriousness of those questions. Rather, it is an equitable consideration which must be balanced along with all of the other pertinent factors in determining the propriety or impropriety of granting a stay in this particular case.[10]

The seriousness of the legal issues involved does not by itself secure the state defendants' position with respect to the Court's initial inquiry; a substantial case on the merits must also be tendered. It is here that the state defendants have conspicuously failed. The lack of foundation upon which the state defendants have attempted to justify the current state of affairs in Louisiana can be illustrated best by a brief assessment of their four general objections to these proceedings and the Court's concomitant findings. First, the state defendants complain that the Court, in its December 23, 1992 order, 811 F.Supp. 1151, reinstating summary judgment in favor of the plaintiff, found that the state defendants had conceded the issue of liability. Secondly, the state defendants argue that the *Fordice* decision established a criteria for liability which requires a review of evidence that cannot be adequately considered on a motion for summary judgment. Thirdly, the state defendants contend that the Court erroneously relied on dicta from the remedy portion of these proceedings to justify its reinstatement of summary judgment on the issue of liability. Finally, focusing almost exclusively on the Court's elimination of the multi-board governance system, the state defendants find fault in the remedial plan itself.

### A. Concession of Liability

The state defendants first complain that the Court improperly presumed that they had conceded the issue of liability by entering into settlement negotiations with the United States shortly before the Court issued its order reinstating summary judgment. In support of their position, the state

defendants latch onto a short statement in the Court's opinion which made reference to the negotiations.[11] Upon reviewing the opinion, the Court has found no foundation, whatsoever, for the state defendants' argument. Even a hyper-technical reading of the language does not support their interpretation of the Court's prior opinion. Its discussion was not nor did it purport to be a finding that the state defendants had conceded the liability issue. To the contrary, the commentary was nothing more than a prelude to a twelve page discussion concerning specific objections which this Court would have had no need to address in the event the state defendants had in fact conceded their liability in this matter. The Court thus gives short shrift to this argument.

### B. Issues of Material Fact

The state defendant's second challenge to the Court's reinstatement of summary judgment is that it was improper because their submissions, including affidavits and expert reports, were sufficient to create a factual dispute with respect to: (1) whether there is a causative link between state policies and racial identifiability at Louisiana colleges and universities and (2) whether those state policies can be justified as educationally sound. Their brief also faults the Court for relying on findings of fact from the remedial portion of this case in an alleged attempt to circumvent disputed issues of fact. Specifically, the state defendants assert that:

> The Court's post-Fordice attempt to cure defects in the partial summary judgment on liability by reference to *dicta* in the reasons for the remedial injunction, long after both phases of the bifurcated proceedings have been completed, substantially prejudices the state defendants with respect to the new *Fordice* liability standards, because the Court is, after the fact, either modifying what was a clear understanding of the issues involved in each phase of the bifurcated proceedings and of what proof would be required to pass from one phase to the next or admitting that it

---

10. *See id.*

11. *See* State Defendant's Memorandum of Points and Authorities in Support of Motion for Stay,

R.Doc. No. 618, at 21–22 [hereinafter State Defendants' Memorandum].

proceeded with the bifurcation without this required understanding.

The proper procedural course, according to the state defendants, would have been for the Court to deny summary judgment and then hold a series of evidentiary hearings relative to the issue of liability.

The standards employed in a motion for summary judgment are well-settled. "The Court may grant the motion only if it appears from the pleadings, depositions, admissions, and affidavits considered in the light most favorable to the opposing party that there is no genuine issue of fact for trial and that the moving party is entitled to judgment as a matter of law. Litigants may not be cut off from the right to trial ... if they really have issues to try."[12] However, when there are no genuinely disputed material issues of fact remaining for trial on the merits the Court is well within its province to grant summary judgment.

Lest the defendants forget, in 1988, shortly before this matter was set to proceed to trial, the United States was not alone in contending that no trial was needed as to the issue of liability. Both sides *cross*-moved for summary judgment on that issue attaching to their motions numerous expert reports, depositions, and affidavits. This Court subsequently granted summary judgment in favor of the United States, and the matter proceeded to trial on the outstanding issue of remedy. Numerous hearings were held and the Court made extensive findings of fact with respect to the issue of remedy. Shortly thereafter, the Court, in light of the Fifth Circuit's decision in *Ayers v. Allain*,[13] vacated its decision granting summary judgment in favor of the United States and granted summary judgment in favor of the state of Louisiana. After *Ayers* was overruled by the Supreme Court,[14] the Fifth Circuit vacated this Court's decision which had, in turn, vacated its prior order granting summary in favor the United States. The Court of Appeals then remanded the case for further consideration in light of *Fordice*.

Prior to reinstating summary judgment in favor of the United States, this Court provided the parties with an opportunity to submit legal memoranda and evidence as to why they believed summary judgment in favor of the United States should not be reinstated. In response to the Court's rule to show cause, the state defendants submitted two affidavits addressing the affirmative action efforts in Louisiana's two public law schools (i.e., Southern and LSU Law Centers). Otherwise, no other new evidence was proffered by either the state defendants or plaintiff. Taking the affidavits, legal memoranda, and oral arguments under submission, the Court determined that the state defendants had failed to introduce any evidence that would call into doubt its findings of fact in the extensive prior proceedings. As these findings of fact were specifically relevant to the legal issue of liability and as there was no dispute with respect thereto, the Court reinstated summary judgment in favor of the United States.

A similar turn of events occurred in *Itel Capital Corp. v. Cups Coal Co.*[15] The district court in that case bifurcated the proceedings and ordered a separate trial for several of the defendant's counterclaims. After a jury found in favor the plaintiff, the plaintiff moved for summary judgment on the remaining counterclaims "on the ground that the jury's answers to the special interrogatories specifically had determined all relevant issues of fact." Like the state defendants in this case, the defendant in *Itel* argued that the jury's verdict had not disposed of all disputed issues of fact and that granting summary judgment denied the corporation of its right to a trial. The Circuit Court rejected the argument explaining that "where no issue of fact remains, summary judgment decides questions of law and does

---

**12.** *Harvey v. Great Atlantic & Pacific Tea Co.*, 388 F.2d 123, 124 (5th Cir.1968) (citations omitted).

**13.** 914 F.2d 676 (5th Cir.1990) (en banc).

**14.** *United States v. Fordice*, —— U.S. ——, 112 S.Ct. 2727, 120 L.Ed.2d 575 (1992).

**15.** 707 F.2d 1253, 1260–61 (11th Cir.1983) (citing *Harvey v. Great Atlantic & Pacific Tea Co.*, 388 F.2d 123, 124–25 (5th Cir.1968)).

not deprive the losing party of its jury trial right."[16] And since all relevant issues had been decided by the jury, the district court's decision granting summary judgment was upheld.

Procedurally, there is no substantial distinction between *Itel* and this case.[17] Like the jury in *Itel*, this Court made sufficient findings of fact in one segment of the bifurcated proceedings to resolve any outstanding legal issues present in the other segment. The state defendants participated fully and with a clear understanding of the issues prevalent in the remedy proceedings and proffered relevant evidence which this Court gave due consideration but ultimately rejected. Moreover, after the Fifth Circuit remanded the matter to this Court on October 14, 1992, it provided the parties with yet another opportunity to introduce evidence. The state defendants, however, did not rise to the occasion and produced no new evidence that would call the Court's prior findings into doubt. They chose to follow this course despite their knowledge of this Court's prior findings of fact and their obvious relevance to the liability inquiries set forth in *Fordice*. The state of Louisiana's motion for a stay can therefore be viewed as nothing more than another artifice to add to the long list of tactical maneuvers engaged in by the state defendants so as to extend these proceedings in the trial court indefinitely.

### C. The Remedial Plan

The state defendants' fourth and final general objection to the prior proceedings concerns the Court's remedial plan. Of primary concern to the state defendants is that the Court's remedial plan replaces the multi-board governance structure presently overseeing the state system of higher education with a single board.[18] The state defendants argue that the elimination of the multi-board system is improper because it did not contribute to the racial identifiability of Louisiana's colleges and universities. Nor is it, according to the state defendants, an essential ingredient to the remedial plan's purpose of desegregating Louisiana's institutions of higher education. In an ancillary argument, the state defendants contend that the evidence considered by this Court and the Special Master was insufficient to support their findings relative to the multi-board system. As it has done on prior occasions,[19] the Court rejects these arguments outright.

Although organized under Louisiana's Constitution of 1974, the multi-board system represents one of the primary mechanisms through which Louisiana has fostered segregation in its public universities and colleges. Evidence before the Court and Special Master together with the Special Master's findings of fact, which were reviewed under a clearly erroneous standard,[20] left no doubt that the governance boards are not only racially identifiable in their own composition,

**16.** *Id.* at 1261.

**17.** As stated previously, the state defendants now complain that they have been prejudiced because they were denied an opportunity to proceed to trial or present evidence at a full evidentiary hearing. They assert that because the issues with respect to remedy and liability were clearly defined at the time these issues were originally considered and have now been redesignated by *Fordice* that this Court cannot now rely on its prior findings with respect to remedy to support its decision as to liability. They do so despite the fact that the very same issues now relevant to a determination of liability were fully considered, briefed, and argued by the parties during proceedings formally associated with forging an appropriate remedial order.

**18.** It has not escaped the Court's attention that the almost exclusive focus of the state defendants' challenge to the remedial plan concerns

its elimination of the four board system of governance. Thus, the Court is left to conjecture whether the state defendants ignore the plan in its entirety because they find its other aspects unobjectionable or merely not a threat to the status of individual board members.

**19.** *See United States v. Louisiana*, 718 F.Supp. 499, 505 (E.D.La.1989).

**20.** Suggestions by the state defendants that this Court failed to apply any standard of review to the Special Master's factual and legal findings are meritless as the Court stated the following in the first paragraph of its original opinion concerning remedy: "To the extent any matters set forth in the Report and Order were based on findings of fact those findings were reviewed under the clearly erroneous rule. To the extent any matters contained therein were based on conclusions of law, those conclusions were reviewed de novo." *Id.* at 502.

but have consistently promoted racial identifiability in the schools they govern through "unnecessary and costly program duplication."[21] Moreover, it has always been this Court's opinion that their elimination was essential to ensure future compliance with the Constitution, to wit:

> The import of this finding is that the single board solution posits a relationship between efficiency and desegregation.... It is critical to the success of integrating the historically black institutions that they be upgraded and given desirable programs in order to attract a significant number of white students. Only by creating an organizational structure with the power to make program decisions statewide can these efforts be achieved.[22]

Now that the state defendants' objections to these proceedings have been made known and fully examined, the Court is confident and proper in concluding that the likelihood of their success on appeal is remote. After nearly twenty years of litigation, the state defendants continue to avoid addressing the heart of the substantive challenge to their system of higher education, relying instead on hyper-technical procedural objections that lack any merit in the context of this case considering the extensive prior proceedings and its present posture. Accordingly, the Court finds that the state defendants have failed to present a substantial case on the merits.

## IV. EQUITIES

Without a substantial case on the merits, the state defendants' burden to demonstrate that the circumstances of this case warrant a stay is for all practical purposes insurmountable. In order to carry their burden, the state defendants must come forward with sufficient proof to show that the injury and harm, which would inure to their detriment as a result of the implementation of court-ordered relief, would be so overwhelming as

to call into question the logic of the remedial plan itself.

Four years ago the Court made the following observations in its consideration of the equities weighing in favor of and against the issuance of a stay:

> Only one bell in the Court's Opinion and Order would be difficult to unring in the near future, and that is the actual assumption of power by the single administrative board and the accompanying dismantling of the four governing board. We observe, however, that the segregation maintained by the four boards is incompatible with any suggestion that the four board system retains viability....
>
> *Brown* was decided thirty-five years ago. It is high time that higher education in Louisiana be reworked at all levels in a unified effort to improve the education offered in this state to all citizens. This Court will not countenance any delay in the effectuation of the tailored remedies it perceives to be mandated by the federal Constitution and the State's best interests.[23]

As demonstrated below, the Court's assessment of the equities weighing in favor of and against the issuance of a stay is no less true today.

### A. Irreparable Injury

The most crucial equitable factor to the moving party, individually, and to the Court in its consideration of a motion for a stay, is irreparable injury. Where judgment prior to disposition on appeal would work an extreme hardship to the point of causing irreparable injury, the equities shift strongly in favor of an order maintaining the status quo. In this case, the state defendants warn of impending tragedy if the implementation of the remedial order goes forward and have submitted three affidavits in support of their position. No factual documentation, whatsoever, was sub-

---

21. *Id.* at 508; *see id.* at 502–15.

22. *Id.* The Court rejects as insufficient the United States' proposed partial stay which would allow the Board of Regents to conduct the program reviews and other administrative tasks designed for the new single board. The remedial plan was a contemplated effort and its intended

purpose would be undermined if the duties assigned to the single board were carried out under the current regimen.

23. *United States v. Louisiana,* 718 F.Supp. 521, 523 (E.D.La.1989).

mitted to support the allegations contained in the affidavits.[24]

Despite the state defendants' dire warnings of immediate calamity upon implementation of the order, the only reorganization, of any consequence, scheduled to take affect in the early months of the remedial plan is the elimination of the multi-board governance system. The affiants collectively charge, however, that if the remedial order is not stayed and the Court's order is subsequently vacated on appeal that the conversion to a single board system will have caused the state to suffer irrecoverable losses in board officers, staff, material resources, and revenue.

The Court cannot agree with the "sturm and drang" which resonates throughout the state defendants brief and which approaches its crescendo in the appended affidavits proffered on behalf of the state. The Court is rather of the opinion that the conversion to a one-board system will be a significant reform which will of necessity engender some administrative expenditures. However, the financial and administrative costs that are involved in the early portions of the implementation are *not*, in the Court's view, oppressive. In the absence of oppression, the state defendants cannot realistically argue that the effects of implementation rise to a level of irreparable injury. The one-time expenditure outlays associated with a conversion to a single-board system can and should be minimized through proper management and oversight of the conversion process.[25] Over time the remedial plan and in particular the single-board system cannot help but realize savings for the state of Louisiana by reducing its administrative overhead and unnecessary and wasteful program duplication in higher education.[26] Moreover, the remedial plan provides the state with sufficient flexibility to explore constructive options in the installation of the new system, and the Court has previously agreed to work with the parties in a collective effort to ensure that compliance is achieved.

Reorganization is obviously a complicated process, but it is not in itself onerous.[27] The evidence must show something more than mere financial and administrative difficulties.[28] This is especially true here where the constitutional violations are well documented and long-standing.

The state defendants' other allegations of irreparable injury merit less attention. The state defendants, for instance, argue that the remedial plan will result in the loss of faculty members and students who will be put off by the unsettled nature of the Louisiana higher education system. This argument is wholly unsupported and ignores the integral purpose of the remedial order, which is designed to improve the state of higher education in Louisiana. It is only through an upgrade in academic achievement that advancements in faculty and student recruitment can be made. The current system of higher education makes such an improvement a virtual impossibility. Program duplication and the decentralized management structure have, in this state, not only perpetuated a dual system of higher education but have done so at substantial cost both monetarily and in terms of academic achievement. In summary, all of

---

24. The court notes that the affiants are full-time employees of the state of Louisiana and are directly involved in the higher education system which is the subject of this lawsuit. Because of their direct stake in this litigation, their opinions cannot not be properly regarded as those of objective experts.

25. For example, staff and administrative personnel under the current system do not, as the state defendants contend, have to be dispersed and reassembled from scratch. Employee transfer and redesignation procedures offer a simple alternative and can be easily developed. Similar options are available to the state with respect to the other complaints it has artfully manufactured.

26. *Cf. Williams v. Zbaraz*, 442 U.S. 1309, 1312–13, 99 S.Ct. 2095, 2098, 60 L.Ed.2d 1033 (1979) (Stevens, J., in chambers) (denying a stay after finding claims of financial loss unwarranted when record revealed that remedial plan would actually save the state money).

27. By the state defendants own admission, many of the remedial measures ordered by this Court are now mandated by statute. *See* State Defendants Memorandum, *supra* note 11, at 17–20.

28. *Buchanan v. Evans*, 439 U.S. 1360, 1365, 99 S.Ct. 28, 31–32, 58 L.Ed.2d 69 (1978) (Brennan, J., in chambers).

the state defendants' allegations of irreparable injury are unsubstantiated and unfounded.

Louisiana cannot claim that a simple twist of fate brought this litigation to its doorstep. It has been far too often that the federal judiciary has had to intervene against Louisiana and its political subdivisions and in favor of the constitutional rights of Louisiana's citizens. In considering whether to allow the desegregation of Jefferson Parish's school district to proceed some twenty-two years ago, one Supreme Court Justice commented, "Whatever progress toward desegregation has been made apparently, and unfortunately, derives only from judicial action...."[29] This Court concurs only to add that irreparable injury comes from the maintenance of segregative policies which are educationally unsound and not from the dismantling of those policies.

### B. Substantial Harm to Other Parties

In 1964, Louisiana ended, for official purposes, its historical policy of maintaining separate universities and colleges for blacks and whites. The root of that segregative policy, however, has never been eradicated. Over the last twenty-nine years, the state has institutionalized policies seemingly neutral in nature but which have the effect of restricting the choice of both black and white students. In the history of this state, there has never been a single generation of students or potential students who have enjoyed the freedom of choice without the hinderance of state action. The state of Louisiana's public policy choices have therefore substantially harmed countless citizens who have been forced to attend schools ill-suited to meet their academic potential. The issuance of a stay at this time would only allow this harm to continue unchecked. The harm of the status quo, however, is not limited to those individuals who have considered a college education. Quite the contrary, when a state system of higher education needlessly wastes limited resources in maintaining racially identifiable schools, the entire economic welfare of the state is jeopardized. Not only are students receiving less than the best in educational programs but Louisiana is denying itself financial resources which could be used to enrich its citizens through economic investment.[30]

### C. Public Interest

The remaining equitable factor to be weighed in the balance is whether the granting of the stay would serve the public interest. State sponsored segregation, whether overt or masquerading as separate but equal, provides no useful benefits to our society. And to issue a stay in this matter would mean that the segregative effects of Louisiana's higher education system would be allowed to continue full stead for several additional years; a proposition contrary to public welfare. The state defendants, nevertheless, argue that a stay would serve the public interest by ensuring that the citizens of Louisiana's choice for a higher education system, as expressed in the state constitution, is honored.

The state defendants are by no means the first to profess that principles of federalism are violated when a federal court imposes remedial orders upon its institutions. States have consistently asserted this argument in civil rights litigation, and they have been uniformly rejected by the federal courts. The supremacy of the federal Constitution over state constitutions and laws is no longer an issue subject to challenge. This, of course, does not mean that the federal judiciary will not give due deference to state public policy choices, but it cannot stand idly by when state action violates the federal Constitution. The public interest consideration, thus then, weighs heavily against granting a stay in this case.

29. *Dandridge v. Jefferson Parish School Board,* 404 U.S. 1219, 1220, 92 S.Ct. 18, 19, 30 L.Ed.2d 23 (1971) (Marshall, J., in chambers).

30. The state defendants brazenly argue that the Court's remedial order threatens a laundry list of student, faculty, and administrator constitutional rights, including the right to academic freedom, expression, association, religion, liberty and property, and interstate travel. This argument is specious and warrants no substantive discussion.

## V. CONCLUSION

The state defendants have neither carried their burden of proof nor persuasion and the Court is convinced that a stay of these proceedings pending appeal would not serve equity. The state defendants' remote chance of success on the merits as well as the individual relevant equitable factors each call for immediate and effective relief for the plaintiff. Thus, all of the foregoing warrant denial of the state defendants' motion for an order staying this Court's remedial plan pending an appeal. Accordingly,

IT IS ORDERED that the state defendants' motion for an order staying the implementation of this Court's remedial plan pending review by the United States Court of Appeals for the Fifth Circuit is hereby DENIED.